CHARLES R. BISHOP, SAML. M. DAMON, CHARLES M. HYDE, CHARLES M. COOKE and JOSEPH O. CARTER, Trustees under the Will of Mrs. B. P. Bishop, deceased, *vs.* KALA (k.) and MAKAONI (w.)

### ON EXCEPTIONS.

### SPECIAL TERM, MARCH, 1889.

JUDD, C.J., McCULLY, PRESTON, BICKERTON and DOLE, JJ.

To sustain title by prescription, the defendant's possession must be adverse, hostile, exclusive and notorious.

The facts of the case showing that the possession of defendants was not exclusive nor adverse to the plaintiffs but as their servants, the verdict was set aside as being clearly and decidedly contrary to the evidence.

### OPINION OF THE COURT, BY JUDD, C.J.

In this case the Trustees of Mrs. Bishop's estate seek to recover of defendants the possession of a parcel of land, 242-1000 of an acre in extent, situate in Kakaako, Honolulu, near the Immigration Depot. It was proved as claimed in the declaration, and is not denied by defendants, that this lot of land is a part of the land of Kaakaukukui, granted to Victoria Kamamalu by Royal Patent number 4483. It was also proved, and it is

not disputed by defendants, that the paper title to the land sued for is in the plaintiffs by descent from Victoria Kamamalu, to her father, M. Kekuanaoa, thence to his children, Kamehameha V. and Ruth Keelikolani, and by the death of Kamehameha V. it all passed to Ruth Keelikolani and from her by descent and devise to Mrs. B. P. Bishop, whose trustees under her will the plaintiffs are.

The plaintiffs' evidence tended to show that one Keau, whose son and widow the defendants are respectively, occupied the land in question as tenant of the plaintiffs and their predecessors, his business being a fisherman and the lot being used as a place for the storing of canoes and nets.

The defense was title by prescription, and the defendants offered evidence tending to show that Keau took possession of this lot as an invader and continued to live upon it as his own for a period of over thirty years.

The verdict of a mixed jury was in favor of the defendants.

The plaintiffs excepted to the verdict as being contrary to the law and the weight of evidence, and moved for a new trial, which was refused *pro forma* by the presiding Justice (Bickerton), to which refusal the case comes by exceptions to the Full Court.

The rule of law as laid down in *Howland vs. Jacobs*, 2 Hawn., 155, is that " a new trial will not be granted on the ground that the verdict is against the weight of evidence, unless it clearly appears that the verdict is so manifestly against evidence as to lead to the conviction that either a mistake has been committed or that injustice has been done on the part of the jury."

In *Forbes vs. Gibson*, 3 Hawn., 260, the Court held "that a verdict will not be set aside unless clearly, palpably, decidedly and strongly against the evidence."

In *Wight vs. Jones*, 3 Hawn., 755, a new trial was refused because the verdict was not "manifestly the result of bias or misunderstanding of the evidence."

The converse of these propositions is that if it appears clearly to the Court that the verdict is so manifestly against evidence

as to induce the conviction that a mistake has been made or that injustice has been done; or when it appears that the verdict is clearly, palpably, decidedly and strongly against the evidence, or is manifestly the result of bias or of misunderstanding on the part of the jury, the verdict will be set aside.

In the case before us we are of opinion that the verdict is of this nature and ought to be set aside and a new trial ordered.

The evidence of Mr. Damon for the plaintiffs is that Keau, the defendant's ancestor, was a very respectable man; that he was the head fisherman under Keelikolani. Says Mr. Damon: "Kamakaoni remarked to me that 'we live under the chiefs.' On the death of Kamehameha V. they often told me that the nets and canoes were under his (Keau's) charge. We gave him lease of fishery, house and lot. During Mrs. Bishop's life he continually brought fish without payment. We only charged him twenty dollars per year. After Keau's and Pauahi's deaths these canoes and nets were to be sold. We gave Makaoni a canoe and net, and others were sold." D. Kahanu, a well-known resident of Kakaako, said that Keau lived on Victoria's land under her, Kekuanaoa, Kamehameha V., Keelikolani and Mrs. Bishop, as fisherman. The land borders on the harbor. The chief owned the nets, canoes, etc. "Keau divided fish and money with the chiefs. He told me about it." This tenancy of Keau is substantiated by Kiwaa, Kanakaokai, Kukahiko and Kuaana, all residents of Kakaako.

The defendant Makaoni, widow of Keau, admits that Victoria gave them in charge two canoes and nets, but says that Keau gave part of fish for use of nets and not for use of the land. She also says that: "The canoes of the chiefs as well as those we had were pulled up on the land. When Victoria died, Kekuanaoa took all canoes away. Kamehameha V. brought them back. We did not tell Kamehameha that we owned the land. Keelikolani's nets and canoes were hauled upon this land. Keau told Keelikolani that he claimed the land. She did not take them away." Kala, the other defendant, and son of Keau, admits that Keau went to fish for the chiefs; also, the canoes

and nets were the chiefs'. The fish were divided between the chiefs and the fisherman. Part of the fish was given to the chiefs for the use of the canoes and nets."

We recite these portions of the testimony to show that by the defendants' own testimony the possession of the defendants could not have been exclusive. The action of the chiefs (who defendants admitted successively owned the land of which the premises in dispute are a part) in placing their canoes and nets on this spot as a right, and removing them as they pleased and replacing them again without question from Keau, would indicate that Keau's use of the premises was not exclusive and not hostile to the chief. If Keau was a trespasser when he entered on this land and claimed the premises as his own, as he must have done in order to have his continued possession of the character that would bar the plaintiffs' right of action, it is most unlikely that he would have been allowed to remain in possession of these premises and to continue in the capacity of head fisherman, caring for the canoes and nets of the chiefs and using them in the fisheries adjacent. Something more than mere possession for twenty years is necessary ; all the authorities say that the possession must be adverse, hostile, exclusive and notorious.

The assertion of the defendants that the share of fish, or of money divided from its sale, paid by Keau to the chief was as rent for the use of the canoes and nets, is also most unlikely to be true and improbable to have continued so amicably if Keau had ever asserted a claim to the premises occupied by him.

That Keelikolani, in 1874, understood that Keau was living on her land is evidenced by the clause in her lease to Dowsett, in which the house lot occupied by Keau and his family is reserved, though it did not bind Keau, he not being a party to it.

The weight of the whole evidence is so clearly and decidedly in favor of the plaintiffs that we feel that the jury must either have misunderstood its effect or have acted, when they returned

38

a verdict for defendants, from some bias or prejudice, and we feel obliged to set aside the verdict and order a new trial, which is done accordingly.

P. *Neumann* and *J. L. Kaulukou*, for plaintiffs.

*C. Creighton* and *S. K. Kane*, for defendants.